IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
HELENA DIVISION

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 1 5 2005

FRIENDS OF THE LAKEVIEW SCHOOL DISTRICT
INCORPORATION NO. 25 OF PHILLIPS COUNTY, et al.

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

**PLAINTIFFS**

VS.                                        2:04CV00184 GH

MIKE HUCKABEE in his official capacity, as Governor
of the State of Arkansas

**DEFENDANTS**

## BRIEF IN SUPPORT OF PLAINTIFFS' RESPONSE TO MOTION TO DISMISS

### Overview

The defendants have filed a Motion to Dismiss pursuant to FRCP 12 contending

that the plaintiffs have failed to state a cause of action upon which a continuation of this

cause can be based.   The defendants do not specify what sections or sub-sections of

FRCP 12 upon which he relies for his dismissal.  FRCP 12 is entitled.  A.C.A. §6-13-101,

provides as follows:

> (a)  There shall be only one (1) kind of school district in
> this state, and each shall have the same prerogatives,
> powers, duties, and privileges as herein set forth.

> (b) All school districts which may be hereafter created shall
> be the same kind, with the same prerogatives, powers,
> duties and privileges as provided in this act.

### Defenses and Objections-When and How Presented-by Pleadings or Motions-Motions for Judgment on the Pleadings

Inclusive in FRCP 12 are, of course, a) limitations on the time allowed for filing a

response or answer to a Complaint, b) defenses, c) Motion for Judgment on Pleadings, d)

Preliminary Hearing, e) Motion for a More Definite Statement, f) Motion to Strike, g)

Consolidation of Defense, h) Waiver of Preservation of Certain Defenses.

1



The defendants pled *carte blanche* FRCP 12.  Ordinarily, this would present a problem if there was substance to any of the assertions of the defendants in their Motion and Supportive Brief and the plaintiffs would be forced to file a Motion under FRCP 12(e) for a more definite or clarification of what defense or objection was being pleaded by the defendants.  However, the plaintiffs will not waste this Court's time with a pleading of that nature, but will attempt to address the Motion to Dismiss under the totality of the purview of Rule 12.

### Factual Background

The Lake View School District of Phillips County filed a lawsuit against the State of Arkansas in August of 1992, claiming that the system of public finance for primary and secondary education in the State of Arkansas was unconstitutional.  As a result of that initial action, three Arkansas Supreme Court decisions have emerged from that litigation and/or of record as *Tucker v. The Lake View School District No. 25*, 323 Ark. 693, 917 S.W.2d 530 (Ark. 1996) (*Lake View I*); *Lake View School District No. 25 v. Huckabee*, 340 Ark. 418, 10 S.W.3d, 892 (Ark. 2000) (*Lake View II*), finally, *Lake View School District v. Huckabee,* 351 Ark. 31, 91 S.W.3d, 472 (Ark. 2002) (*Lake View III*). Although there has been a Supplemental Opinion, the plaintiffs do not consider that opinion to be substantive, but one in which the Arkansas Supreme Court "attempted" to exercise some type of supervisory authority.

The plaintiffs are well aware of the impact of this assertion, but this Court upon review of the Supplemental Opinion will find that, (1) there had been no trial below upon which the Arkansas Supreme Court could have exercise review authority, and (2) under the Special Master's provision of the ARCP 53 the Arkansas Supreme Court did not have

authority to appoint a Special Master in that situation since, no action was pending. ARCP 53(a). Plaintiffs contention were borne out in the end result. The unsuccessful attempt to short-circuit the review resulted in the Arkansas Supreme Court agreeing that it had no jurisdiction to hear matters presented supplemental to its on appeal opinion in Lake View III. See *Lake View No. 25 of Phillips County, Arkansas, et. al. v. Huckabee, et. al.*, S.W.3d _____, 2004 WL 1406270 (June 18, 2004). Since the initial decision of the Pulaski County Trial Court September of 1994, amended December of 1994, the Arkansas General Assembly has met in the following years: 1995, 1997, 1999, 2001, and 2003 in regular sessions. There have been a number of Special Sessions during this same period and the combination of these meetings of the General Assembly during its regular constitutional acquired assemblage and the Special Sessions called at the request of the Governor have resulted in a system of public school finance that in accordance with the words of Justice Glaze in the dissenting opinion in the Supplemental Order of the Court of 2004 stated:

> As of that date and until this date still has  not been declared to be constitutional or through the efforts and in many instances of non-efforts of the State of Arkansas has not produced a constitutional system of public school finance.

In 2002, the Arkansas General Assembly in its Second Extraordinary Sessions passed Act 59 and Act 60 of 2003. Act 60 required the Executive Branch of Government, specifically the defendants' Governor, Arkansas State Department of Education and the State Board of Education to determine what school district in the State of Arkansas (at the time there were approximately 310 school districts) which had students of less than 350 according to Average Daily Membership (ADM) in each of the proceeding two years and to advise those school districts that if they did not "voluntarily

agree" to be administratively consolidated or "voluntarily agree" to be annexed to another school district with an Average Daily Membership (ADM) of more than 350 students which would be forced to consolidate through an administrative procedure approved by the defendant State Board of Education which would be implemented on or about July 1, 2003.

The defendant State Board of Education set up procedures by which they would implement Act 60. See Exhibit 1-example attached. The Lake View School District, as a result of Exhibit 1, was given an opportunity to appear before the State School Board Panel and present its contentions and objections to consolidation in a *ten minute period* thereafter it would be consolidated. It is to be noted, that the process set-out by the defendant state school board while on the one hand, allowing a hearing, at which time the plaintiff school district could present its contentions against consolidation or its destruction as a public school entity by the authority of Act 60, simultaneously the decision of the board prior to this "hearing" was already set-in stone. All the school districts appearing including the plaintiffs were consolidated were on the list of 57 identified by the defendants as districts with an "ADM" of under 350 students.

The plaintiff Lake View School District refused to voluntarily submit a Petition for Administrated Consolidation or Annexation and the State School Board defendant ordered on May 28, 2004, the administrative consolidation of the Lake View School District with Barton-Lexa School District. See Complaint (Exhibit 4a).

It may be of some note to this Court that the original Order of the Trial Court issued September 9, 1994, and amended December 21, 1994, found that the State defendants have an unconstitutional system of public finance and stayed its decision for

4

two years allowing the State time for correction. (See Complaint Exhibit 3). The State of Arkansas did not abide by the two year period and, in fact, was found to have an unconstitutional system of public education as of the Court's findings in *Lake View III* which was 2002. Between December of 1994 and *Lake View III* of 2004, the State of Arkansas purposely and deliberately maintained a system of unconstitutional public school finance in violation of the plaintiffs' right. That this period of unconstitutional public finance is one of the key elements, it is contended, why the plaintiffs' school district was forced to consolidate. The lack of funding of the public school system over a prolonged period of time created a potentially tremendous financial burden on the State, when it finally was ordered to finance Arkansas school districts equitably and adequately.

The plaintiffs contend that as a result of *Lake View III* and the Arkansas Supreme Court Order that the State provides a system of equity and adequacy in public school finance to the plaintiffs, as patrons of the Lake View School District and their wards, in an act of retaliation tinged with racial hostility the State defendants created a pretext by the passage of Amendments 59 and 60 to close the plaintiffs' school district. It is further contended, that the State of Arkansas knew from its own statistical records that the Lake View School District had an "ADM" in the previous two years before passage of same of less than 350 students. It further knew that the Lake View School District was predominantly African-American, and knew that the closing of districts that were 350 or less students "ADM" would close practically every African-American school district in the State.

Additionally and more forcible than that argument is the very records of the state defendants. The defendant State School Board did not consolidate, as contended in the

Complaint, one predominantly white school district with a larger African-American district. All of the school districts that were consolidated or eliminated were those that were African-American, no 350 ADM or less predominantly Caucasian school district was merged with an African-American School District under any circumstances. The opinion of the State Attorney General in this case, which was a legal guideline to the state defendants in the consolidation process shows undisputably that race was the only concern in the consolidation process. Race was not just the central concern, but it was the only concern. See Exhibit 2-a copy of the Attorney General's Opinion.

The contention of the state defendants that somehow the State of Arkansas Supreme Court in its Supplemental Opinion of June 18, 2004, found that the 84th General Assembly through its Regular and Second Extraordinary Session adequately addressed the concerns of the Court in its *Lake View III* decision is unsupported by any aspects of that decision. A perusal of *Lake View School v. Huckabee,* S.W.3d _____, 2004 WL 1406270 (June 18, 2004), will leave this Court with no doubt that the only specific mention of whether or not the General Assembly had, in fact, passed a constitutional system is found in the dissent of Justice Glaze:

> Even assuming its best intention, this Court loses exclusive control of this litigation once it releases its jurisdiction, for example, parties will predictably file related suits in federal courts and other state courts, thereby permitting parties to engage in piecemeal litigation to resolve the same or related issues as those found in the *Lake View* litigation.
>
> One most remember that this Court has not yet declared the State's School funding System Constitutional, because there obviously are still more officials most do.
>
> Also it is to be noted, as a matter of public record that at the time the Arkansas

Supreme Court decided *Lake View III* Acts 59 and 60 had not been passed. The

constitutionality of Acts 59 and 60 via violations of the 14th Amendment to the U. S. Constitution nor whether Acts 59 and 60 violated federal statutory provisions alleged in plaintiffs' initial Complaint as 42 U.S. 1981, 42 U.S. 1982, 42 U.S. 1983 or Title VI of the 1964 voting rights has not been presented or determined by the Arkansas Supreme Court.   In fact, no portions of the alleged legislative enactments of the 84th General Assembly has been subject to challenge on the basis of violation of the U. S. Constitution.   It is unfortunate that the State has alleged in its Brief in Support of Motion to Dismiss that the Arkansas Supreme Court has somehow given its constitutional approval of any tenets or characteristics of Act 59 and Act 60 of the Second Extraordinary Session of the General Assembly of Arkansas 2003. Quoting the defendants' Brief on this matter which is found, *in toto,* at page 17 of its Brief in Support the following:

> It is plain from the Supreme Court decision that all the legislative acts passed after the Supreme Court's 2002 Opinion was open for scrutiny and challenge to any parties (including Act 59 and Act 60), and it is also plain that Lake View (and the rest of the plaintiffs' class, which included the plaintiffs in this action) had a full and fair opportunity, and did not attack the validity of Acts 59 and 60 before the Special Master and, again, before the Supreme Court.  The Court however did not grant Lake View or the class any relief with regard to those Acts and dismissed the case allowing the mandate to issue.

If the Court would take this elongated averment by the defendants as a proffer of the truth proof asserted, it would be immeasurably misled.  However, if this instant Court simply considers the defendants' statements and assertions on this issue as an attempt by the defendants to put forth their best effort or argument, no harm will be done.  This Court can analyze the record without my elaborating on this particular subject extensively and will find that there was no substantive arguments on 2003 legislative

enactments presented to either the Special Master and/or subsequently to the Arkansas Supreme Court. In fact, it was the argument of the Lake View plaintiffs that the Arkansas Supreme Court did not have jurisdiction either to appoint a Special Master nor did it have jurisdiction to review the constitutionality of the 2003 Second Extraordinary Session of the Arkansas Legislature.

The Supreme Court is not a trial court and the issues that were unfortunately examined by the Special Masters and ultimately dismissed for lack of jurisdiction by the Arkansas Supreme Court in its June 18, 2004 Order were matters that should have been examined by a trial court and, if necessary, reviewed by the Arkansas Supreme Court. Ultimately, the Arkansas Supreme Court agreed with the position of the Lake View plaintiffs, i.e. it had no jurisdiction. Therefore, the assertion of the State that there was an opportunity to have a full and fair hearing on Act 59 and 60 falls hollow. Rules of Arkansas Supreme Court 1-2; Rule 6-5.

The defendants assert that there is an "inextricably intertwining" between the issues of the previous State litigation of school finance previously referred to as *Lake View I, II, and III* in the present action. The defendants further contend that the plaintiffs' instant lawsuit is an attempt to "undermine previous Arkansas Supreme Court's decision" without identifying specifically what decisions are being undermined. The plaintiffs have carefully examined *Lake View I, II, and III* and cannot find any reference in any of those case that would tend to "inextricably intertwine" the present litigation with those causes of action. There is no Arkansas Supreme Court decision that plaintiffs' counsel is aware of in which Act 59 or Act 60 have been litigated. The

assertion by defendants of *Rooker-Feldman* doctrine is at best, a "red-herring" and at worst, simply a waste of pen, paper and this Court's valuable time.

It is important for this Court to also note the allegations in the plaintiffs' Complaint to which no argument is presented by the defendants in its Motion to Dismiss. The "canned" assertions of the defendants embracing sovereign immunity, U. S. Constitutional Eleventh Amendment immunities and *Rooker-Feldman* are surely arguments that this Court have seen asserted literally thousands of times, but they have no application to the instance Complaint nor does the assertion of these three primary "boiler-plate" defenses cover the spectrum of allegation of violations of federal law appearing on the face of the Complaint.

One startling example of the omission of any defense to the Complaint in the Motion to Dismiss is the allegation that actions of the state defendants, in particular instances: (1) violates Title VI of the 1964 Civil Rights Act and therefore, Eleventh Amendment immunities would not apply; (2) in specific instances the allegations of the Complaint contends that there have been violations of the constitutional doctrines established in *Brown v. Board*, [cite omitted], or that the implementation of Act 60 violates the plaintiffs' right to equal protection, via the application of Arkansas taxation laws in an unequal manner. The plaintiffs pay millages at a rate in the Lake View School District area higher than those paid by plaintiffs in the Barton School District area. See Exhibit 3. These examples are but a few. Suffice it to say, it is the contention therefore of plaintiffs that those allegations in the Complaint not specifically challenged in the Motion to Dismiss which the defendants appears to be use as a substitute for filing an Answer should be considered admitted. The facts of the Complaint are undisputed by the

Motion to Dismiss and plaintiffs will not reiterate or republish those facts as a portion of this Response. However, same is incorporated by reference as set-out word for word.

### State of the Law

The defendants have filed a generic Motion to Dismiss pursuant to Rule 12 of the FRCP contending that the plaintiffs State claims are (a) barred by sovereign immunity; (b) plaintiffs Section 1983 State claims are barred by sovereign immunity; © plaintiffs Section 1983 State claims against the Governor presents no *justiciable case or controversy*; (d) plaintiffs lack standing to assert voting right acts; (e) Complaint fails to state a claim upon which relief can be granted; (f) Court lacks subject-matter jurisdiction or alternatively, their claims are barred by res judicata. There is absolutely no grounds for these assertions and there is no substantive support for same in the defendants' Brief. This Court has longed recognize that the standard for evaluating a Rule 12(b)(6) Motion to Dismiss is to construe the Complaint in a light most favorable to the plaintiffs, *Murphy v. Lancaster* 950 F.2d 746, (8th Cir. 1992*); Flahertz v. Lane* 1999 F.3d 607, (7th Cir. 1999).

Federal courts hold in disfavor of Motion to Dismiss of *Branley v. Wilson* 495 F.2d 714, (8th Cir. 1974); *Hishon v. King and Spalding* 467 U.S. 6, 9 (1984); *Ring v. First Interstate Mortgage, Inc.* 984 F.2d 924, (8th Cir. 1993). The federal judiciary has been especially hesitant and weary of the dismissal of pleadings of civil rights violation. *Springdale Education Association v. Springdale School District* 133 F.3d 649, (8th Cir. 1998).

Declaratory Judgment and Injunctive Relief contends plaintiffs are available in this Court irrespective of allegations of the Eleventh Amendment bar. The defendants in

10

their Motion to Dismiss do not contend that prospective Declaratory Judgment and Injunctive Relief are not available to the plaintiffs. Even if it appears on the face of the pleading that recovery is remote and unlikely, Courts have determined that that is not an appropriate test for granting dismissal. *Swierkiewicz v. Sorema N. A.*, 534 U. S. __, 1 5 2 Law Ed 2d 1 (2002); *Scheruer v. Rhodes*, 416 U.S. 232 (1974). The U. S. Supreme Court has specifically applied this stringent standard for considering Motion to Dismiss as it relates to civil rights cases. *Reed v. Reed*, 303 U.S. 71 (1971); *Frontiero v. Richardson*, 411 U. S. 677 (1973).

## <u>Response to Defendants Argument I</u>

The defendants contends that the allegations by plaintiffs that State of Arkansas has violated its own constitution standards of Arkansas Civil Rights Act of 1993 and other State laws should be dismissed or barred because of sovereign immunity. In support of this bold contention, the defendants cites *Pennhurst v. Halderman*, 465 U.S.89 (1984). Underpins contentions that supplemental jurisdiction in the federal judiciary does not abrogate their States' sovereign immunity. Of course, that is not exactly what he *Pennhurst* case says. This Court has an obligation to examine the claim of the plaintiffs upon proof and make a determination whether this Court's jurisdiction over those claims barred by the Eleventh Amendment. There is no absolute bar to this Court's jurisdiction over these claims under the Eleventh Amendment. *Pennhurst*, of course, does not represent a bar of any nature to Declaratory and Injunctive Relief. In *Ex Parte Young* 209 U.S. 123 (1908), the Court established two conditions under which cases brought against state official remained viable in State Court notwithstanding the Eleventh Amendment. The individual actions against a state official comes within the subject

matter jurisdiction of the Court (1) if the plaintiffs allege that the officials are acting in violation of federal law and/or (2) plaintiffs are seeking perspective relief to address an ongoing violation, not compensation or retroactive relief for violations pass. See *Idaho v. Coeur D (Alene tribe of Idaho)*, 521 U.S. (1997).

The claiming of the Eleventh Amendment does not bar Injunctive Relief against State officials when those State officials have acted in violation of the federal constitution or those officials are acting unconstitutional. Conduct of the nature in which plaintiffs allege that State officials acted unconstitutionally or have an ongoing pattern in place of enforcing laws that are unconstitutional strips that State officer of his or her official representative character, thus, binding their hands from the embrace of the Eleventh Amendment Section. *Almond Hill School, et. al. v. U. S. Department of Agricultural, et. al.*, 768 F.2d 1030, (9th Cir. 1985). Clearly, the defendants do not claim that the Eleventh Amendment bars Injunctive Relief against State officials for violating federal law.

Also, as emphatic as the non-existence immunity for state officials who violate federal law, is the conclusiveness of the proposition that all judgments by the federal court which venture into the State treasury are not barred by the Eleventh Amendment. The state defendants boldly claims that the plaintiffs action should be dismiss because it will affect the State treasury in a negative way and that retroactive award of compensation is prohibited by the Eleventh Amendment. While this is ordinary true, it is not absolutely true. Fiscal affects on State treasury are acceptable to the extent they are necessary and incidental to compliance with respective Orders. *Hutto v. Finney*, 436 U. S. 678 (1978); *Larson vs. Shelby Co, Tn.*, 211 F.3d 331 (6th Cir. 2000); *Clark v. Bernard*,

108 U.S. 436 (1883); *Thiokol Corp. vs. Dept. Of Treasury*, 987 F.2d 376 (6th Cir. 1993) infra.

If the Court rules in favor of the plaintiffs, but does not rule that the plaintiffs are entitled to compensation for the violation of its federal statutory rights and U.S. constitutional rights, then it would be an nearly empty verdict. The compensation requested by the plaintiffs is a necessary and ancillary to the enforcement of a favorable verdict. Plaintiffs as patrons, citizens and parents of the Lake View School District have been denied according to the State's own finance record, as established in the series of Lake View School District funding cases constitutional funding for the period of time set-out in the Complaint.

### Response to Defendants Argument II

The Defendants asserts that the plaintiffs suit against the State pursuant to 42 U.S. C. 1983 is barred by *Pennhurst, supra*; *Murphy v. State of Arkansas*, 127 F.3d 750, 754 (8th Cir. 1997); *Burk v. Beene*, 948 F.2d 489; and *Will v. Michigan Dept. of State Police, supra*. Of course, this is simply a repetition of defendants' Argument I. Sovereign Immunity does not include Declaratory Judgment or Injunctive Relief against State officials. *TTEA v. Yslata del, Sur Pueblo*, 181 F.3d 697, (5th Cir 1999). In the cause of *Monroe v. Pape*, 385 U. S. 167, 187 (1981), the U. S. Supreme Court stated emphatically that § 1983 lawsuits were available to the plaintiffs as an avenue for enforcement of their rights in federal court because they had not historically had the availability of State tribune for the enforcement of there U.S. constitutional rights, *Ex Parte Young* recognize that suits may be brought in federal courts against State official in their official capacity for perspective Injunctive Relief and that State officials are persons under § 1983 when

sued for Injunctive Relief because such actions are not treated as actions against the State. *Will v. Michigan Dept. of State Police, supra,* at 71, nt.10; *Kentucky v. Graham,* 473 U. S. 159, 167 n.9 (1985).

### Response to Defendants' Argument III

The defendants contend that the Governor should be dismissed. The Governor of the State of Arkansas was sued in his official capacity under § 1981, 1982, 1983, First Amendment to the U. S. Constitution, Fifth Amendment of the U. S. Constitution, and Fourteenth Amendment to the U. S. Constitution. It is obvious on the face of the defendants Supportive Brief that there's only a contention that the Governor cannot be sued in his official capacity under §1983. There is also an admission that the Governor can be sued in his official capacity under the other statutory and constitutional sections aforementioned. Defendant contends that the Governor did not sign the legislation now a part of Arkansas law and known as Act 60 of the Second Extraordinary Session of General Assembly 2003. Plaintiff contends the Governor executed these Acts and has the ability to enforce same by use of both executive and judicial action. It is a matter of public record that the Governor of the State of Arkansas did not sign the legislature only because of instead of a 350 student cut-off for consolidation or closing the Governor wanted a higher cut-off figure. The Governor certainly did not veto the legislation which would have been an act expressing opposition or reluctance. In this case, the Executive Branch of Government led by the Governor, the Director of the Department of Education and the Arkansas State Board of Education implemented and are still implementing Act 60 which plaintiffs contends is unconstitutional. The Executive Branch is directly authorized by the by the statute to implement it.

The ex parte *Young* doctrine has not been limited to cases where no state forum is available to decide whether federal law entitles the plaintiffs to Injunctive Relief. See <u>CSX Transportation, Inc. v. Board of Public Work</u>, 137 F.3d 537, (4th Cir. 1998). The Eleventh Amendment does not preclude actions against state officials sued in their official capacity for perspective Injunctive or Declaratory Relief. <u>Kentucky v. Graham</u>, 473 U.S. 159 n14, (1985); <u>Doe v. Wigginton</u>, 21 F.3d 733, n3 (6th Cir. 1994); <u>Allinder v. Ohio</u>, 880 F.2d 1180 (6th Cir. 1987). Under the law recognized by <u>Okpalobi v. Foster</u>, 244 F.3d, (5th Cir. 2001) state officials must be acting or threatening to act or at least have the ability to enforce an unconstitutional act in order for *Ex Parte Young* exception to the Eleventh Amendment immunity to apply.

The Governor in the instant cause undoubtedly is participating in the enforcement of Act 60 to the extent that it's being exercised. In making an officer of a state a party, the Court in *Young*, plainly stated that injunctive relief is available and the naming of an officer in an injunctive or declaratory action is available if such *"officer has some connections with the enforcement of the act...the fact that the State officer by virtue of his office has some connections with the enforcement of the act is an important material fact, at 157. The Court in* <u>*Allied Artist Picture Corporation v. Rhode*</u>*, 679 F.2d 666 (6th Cir 1982), affirmed 496 F. Supp. 408, 424-427 (S.D. Ohio, 1980) found that the general duty to enforce law is a sufficient connection to satisfy the requirements of Young.*

More importantly as will be discussed and illustrated below the State has waived its Eleventh Amendment Immunities in this action and therefore the argument of immunity for any of its state offices is not well taken. <u>Clark v. Bernard</u>, 108 U.S. 436, (1883); *Thiokol Corp v. Dept. of Treasury*, 987 F.2d 376 (6th Cir. 1993).

Sovereign can be waived by the State, if the State has consented to suit against it in federal court. The State's acceptance of Title VI funding under the Civil Rights Act of 1964 as amended, is a waiver of State's Eleventh Amendment Immunity in exchange for receipt of federal funds with respect to both statutory provisions and administrative regulations of Title VI. *Sandoval v. Hagan*, 197 F.3d 484 (11th Cir. 1999). Under *Sandoval* individuals that seek respective relief for ongoing violation of federal law may levy against state officials. The plaintiffs in this cause are seeking partial respective relief through the issuance by this Court of a permanent injunction enjoining the defendants from enforcement of Acts 59 and 60. The U.S. Supreme Court found <u>*Seminole Tribe of Florida v. Florida*</u>, 517 U.S. 41 (1996) that it was not unremarkable. The State waived their sovereign immunity through overt consent. <u>*Kates v. Odom*</u>, 707 F.2d 1176, 1183 n.4 (11th Cir 1983).

The State of Arkansas has accepted Title VI funds from the federal government as alleged in the sixth cause of plaintiffs' Complaint that there is an unconstitutional expenditure of said funds that have an adverse effect upon the plaintiffs as parents and patrons within their school district. The State in its Motion to Dismiss does not challenge the assertion of the plaintiffs that there is a historic and ongoing violation by the State defendants of Title VI. As stated in *Sandoval, "neither sides dispute that Title VI, Sec 2000(d)-7 of the Rehabilitation Act Amendment of 1986, explicitly waives State sovereign immunities for Title VI suits."* See also <u>*Lane v. Pena*</u>, 518 U.S. 187, 2000 (1996); *Little Rock v. Mauney*, 183 F.3d 816 (8th Cir. 1999). Thus the argument against the Governor as a named plaintiff in this cause under any theory that has been purported by the

defendants in their Motion and Supportive Brief is without substance and should be disregarded by this Court.

### Response to Defendants' Argument IV

The defendants do not make much of an effort to argue this issue.  Under the authority of *Children's Health Care is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412 (6th Cir 1996) (casual connection and likely redress doctrine applicable), the Court found that the *Young* doctrine does not protect officers of the State who are obligated with some duty regarding the enforcement of laws of the State and who threatens to enforce those laws against persons challenging their constitutionality subjecting these officers to injunctions and declaratory judgments issued by federal courts.  Article III of the U. S. Constitution provides that one of the prerequisite for *standing* to sue in federal courts requires a genuine case or controversy.  Why the defendants have interjected this issue in a cause of this nature where the pleadings are so plain on their face is somewhat baffling, but a response is required.   Certainly, the defendants do not claim that there is no nexus between the exercise of the State defendants' authority under Act 59 or 60 and the interest of the plaintiffs in preventing the destruction of their local school district, voting rights, property rights, tax interests or the effect of these Acts on the quality of education available to their children or wards.   Of course, the case or controversy doctrine is basically one in which the defendants are challenging the standing of the plaintiffs to bring the instant lawsuit.  The "zone of interest" issue raise, infra, is almost identical to the case of controversy doctrine at hand.  The fundamental aspect of *standing* is that it focuses on the parties seeking to get his Complaint before a federal court and not on the issues he wishes to have adjudicated.  The gist (of the question of standing) is whether

17

the party seeking relief has alleged such a personal stake and outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon the Court so largely depends for illumination of difficult constitutional questions. *Baker v. Carr*, 369 U. S. 186, 2004 (1962).

It is acknowledged precedent that an actual threat of enforcement by State official is not even required for justiciability under Article III. The plaintiffs contend that not only the actual threat of enforcement is present, but in the instant cause Act 59 and 60 have been implemented and are being enforced, thus satisfying Article III. The enforcement of Acts 59 and 60 has caused injury to the plaintiffs' rights which they contend can be remedied by the relief sought in this action if granted by the Court. *Standing* is satisfied; case of controversy is likewise satisfied under the pleadings filed by the plaintiffs in this cause. Injury to the plaintiffs' constitutional rights politically, socially and educationally as well as economically has already been consummated by the actions of the plaintiffs in this cause. Monies that was secured from taxation of their local properties have been transferred to the control and use of others as alleged in the Complaint. See *Pennsylvania v. West Virginia*, 268 U. S. 553 (1993).

In the case of *Long v. Van de Kamp*, 961 F.2d at 152 (1992), the Court found that a case or controversy did not exist, even though a statute was available when there has been no enforcement of same and a lack of threaten enforcement by the Attorney General of the State of California. A fact that a statute is facially-self-enforcing or racially neutral does not mean that the statute is immune from federal court review because of the Eleventh Amendment. The Court looks to the interest of the State of seeing legislature enforced and to the ability of private parties to effectuate its mandate for the purpose of

determining whether a State officer may be sued to enjoin an unconstitutional statutes enforcement, nor is it necessary that the State officers' duty be declared in the act.

Unconstitutional provisions require no actual enforcement to be subject to injunction or a State officer being made a party to an action in Federal Court under the *Young* doctrine.

**Response to Defendants' Argument V**

The 42 U.S.C. § 1973(a) commonly known as the Federal Voting Rights Act states:

> Denial or abridgement of the right to vote on the account of race or color through voting qualifications or prerequisite; establishment of a violation.

The Federal Voting Rights Act of 1965 as amended simply requires that no State of political subdivision shall create by law nor custom any impediment that denies or bridges the rights of any citizens within the United States to vote on account of race or color. Establishment of a violation of the rights created under §1973 is based on the *totality of the circumstances;* plaintiffs must show that the political process leading to nominations for election in a political subdivision is not equally opened to participation by members of a class for citizens protected by the Act in that the members of the protected class has less opportunities than other members of the electorate to participate in the process and to elect representatives of their choice. The statute furthers elaborates that "the extent to which members of a protected class has been elected to office in the subdivision is one of the circumstances that may be considered.

The defendants failed to present any elements of the Federal Voting Rights Act in their Brief, but contends that the plaintiffs lack *standing* because they do not fall within the "zone of interest protected by the law involved". It's ironic that the defendants failed

19

to give illustration of either the "law involved" or a manner that would evidence the failure of the plaintiffs to fall within the "zone of interest" of the Federal Voting Rights, Act. Yet, the defendants ask that this Court would dismiss the Complaint at this stage of the litigation without any support of authority for their assertion under the instant issue. The granting of a Motion to Dismiss is frowned upon in an action that relates to Civil Rights of a plaintiff and should not be dismissed at the pleading stage unless it is of a certainty that the plaintiffs are not entitled to relief under any facts that could possibly be proved in support of their claim. _Holly v. Sanyo_, 771 F.2d 1161, 64 (8th Cir. 1985). Sec. 5 of the Fourteenth Amendment gives Congress broad powers to enforce amendments and Congress has historically considered one of its highest priorities the enforcement of civil right log. _Newman v. Piggie Park Enterprise, Inc._, 390 U.S. 400 (1968).

The defendants' Argument IV and V are basically identical and the plaintiffs would ask the Court to consider its' Arguments IV and V to merge. In order for _standing_ to be shown in any cause of action a _"party must show that he personally will suffer some actual or threatening injury as a result of the punitive illegal conduct of the defendants; and that injury fairly can be traced to the challenged action; that the injury alleged by the party is likely to be redress by a favorable decision or as another Court has placed it a party must show, (a) injury in fact, (b) actual or imminent, not conjectural or hypothetical, © likely, that the injury will be redress by a favorable decision."_ See _Valley Forge Christian College v. American United for Separation of Church and State, Inc._, 454 U.S. 464, 472 (1982); _LuJan v. Defenders of Wild Life_, 504 U.S. 555, 560-61 (1992); _Flast v. Corne_, 390 U. S. 83 (1968); _Baker v. Carr_, 399 U. S. 186 (1992).

The defendants have no reference point for asserting a lack of "zone of interest" by the plaintiffs in this cause.   At least, there is none factually illustrated in the defendants supportive brief, factually illustrated or even alleged except to utter the term "zone of interest".   Prudential standing is satisfied when injury asserted by plaintiffs actually fall within the "zone of interest" to be regulated by statute in question.   Giving the nature of Act 59 and 60 and their consequences as alleged in the Complaint upon the constitutional rights of the plaintiff, the unarguable laws of voting rights as provided by 42 U. S. C. § 1973 et. seq., including dilution of the plaintiffs voting strength and loss of seven members of their previous school board and total loss of membership on a perspective new board to constitute a specific injury permitting standing under any scenario. *Federal Election Commission v. Atkins*, 545 U.S. 11 (1998).

The defendants in this cause specifically referenced Sec. 5 of the Voting Rights Act without presenting any argument as to violation of Sec. 2 of the Voting Rights Act. The plaintiffs consider that the defendants admit that there has been a Sec. 2 violation. *Thornburg v. Gingles*, 480 U. S. 30 (1986).   It is the plaintiffs' contention that Sec. 5 violation pertains more historically to the Court's analysis whether or not pre-clearance requirements have been violated.   (cites omitted).   The defendants have cited cases that have no relevance to the plaintiffs' lawsuit.   The school board members in the State of Arkansas are elected; they are not appointed, so the plaintiffs reference to *Mixon v. Ohio*, 193 F.3d 389 (5th Cir 1989); *Moore v. School Reform Board of City of Detroit*, 147 F. Supp. 679 (ED Mich. 2000), affirmed 293 F.3d 526 (6th Cir 2000).   Equally inapplicable is the defendants' reference to *Mirrione v. Anderson*, 717 F.2d 743 (2nd Cir. 1983) and *Holt Civic Club v. Tuscaloosa*, 439 U.S. 60 (1978) are all inapplicable.

Firstly, the facts in *Mirrione* have no relevance whatsoever to the facts of the instant Complaint. The plaintiffs in the present lawsuit are not asking that this Court grant an Order allowing them to be constitutionally protected to join with a neighboring area in the formation of an election district. The plaintiffs have not made any effort to join with any adjoining election district; the plaintiffs have been forced by Act 60 to suffer the destruction of their school district which is predominantly African-American for the fostering of another school district which is Caucasian. While latitude under the *Holt* decision is given to States in creating various types of political subdivisions, it does not allow the States in creating same to violate 42 U.S.C. 1981, 82, or 83 nor does it allows the State to violate the equal protection and due process clause of the Fourteenth Amendment. The total burden of enforcing constitutionally guaranteed rights should be placed on these African-American plaintiffs. [cite omitted]

The Voting Rights Act of 1965 was passed to protect African-American citizens such as the plaintiff of the injury imposed by the destruction of their school district where they had seven African-American members of a school board for the benefit of preserving or enhancing a white school district, while they have no chance of electing like persons of their choice for governess of educational affairs of their children. There is nothing in the *Morrione* decision that indicates that there was an allegation on part of the resident of Cruz County that they were a protected class. A search of *Morrione* case leaves little doubt that the issue in that action pertained to the singular question whether or not you could split counties so that it would impair the voters of a particular area within that county. There is no application for the factual situation of *Morrione* to the allegations in the plaintiffs' Complaint. The plaintiffs must be given under the prevailing

recognition of the Court's abhorrent to dismissal of Complaints at the pleading stage an opportunity to present proof to substantiate its voting rights injury.  The plaintiffs have alleged that Act 60 has a discriminatory purpose which is evidenced by the result of its implementation, particularly as it relates to the plaintiffs former school district, but unlike the equal protection clause, the Voting Rights Act does not require proof of intent to discriminate 42 U.S.C.A. § 1973(b), *Frank v. Forrest County*, 194 F. Supp. 2d, 867 ED Wis. 202.  The pleadings in this cause satisfied the *Gingles* threshold and the totality of circumstances inquiry.  The weight of legal precedence compels a denial of defendants' Motion to Dismiss while allowing the plaintiffs to establish a trial that the electoral practices of the defendants, complained of, have resulted in abridgement of the denial of the right to vote based upon color and/or race under Sec. 2 of the Voting Rights Act.

Under the result standard of Sec. 2 plaintiffs need not prove that the statutes involved was adopted for the purpose of voters right challenges with a racial discriminatory purpose, but under the totality of the circumstances doctrine proof that the process is not equally open to participation by members of a protected class or that said members have less opportunity than other members of the electorate to participate in the political process is sufficient for verdict.  *Johnson v. Bush*, 214 F. Supp. 2d 1333 Sd Florida (2002).  The implementation of Act 60 has produced a unique situation. Historically, African-Americans in this State have suffered from voter discrimination because of race which has been established in a number of cases adjudicated by the Court.  See *Jeffers v. Clinton*, 730 F. Supp. 196 affirmed, 480 U.S. 1019, 468 (ED Ark. 1989).  The Barton School District, as stated in the Complaint has a history of voting rights' violations and is presently under a consent decree settling a recent suit of this

nature.  In this particular instant, the destruction of the Lake View School District has destroyed the ability of the plaintiffs to participate meaningfully in the electoral process by which persons who would sit on board governing education policies of there children will be selected.   The State has bypassed the ordinary vehicle for determining reapportionment issues, I. e. the State Board of Reapportionment and has granted reapportionment authority in this instant to the Governor, the State Board of Education and the State Department of Education through its Director.  The Voting Rights Act does not require that redistricting planning guarantee victory for minority preferred candidates; rather it mandates that the minorities' opportunities to elect representatives of their choice not be diminished, directly or indirectly by State actions.  Act 60 has lead to retrogression of the position of African-Americans in the Lake View community by providing them with fewer opportunities to elect candidates of their choice under Act 60 that was available prior to Act 60 is without argument. *Georgia v. Ashcroft*, 195 F.2d 25 D.C. (2002).

There are two distinct types of discriminatory practices and procedurals covered under Sec. 2 of the Voting Rights Act of 1965: (1) those that result from voters' denial and (2) those that result in voters' dilution. *Burton v. City of Belle Glade*, 178 F.3d 1075, rehearing and rehearing denied 193 F.3d 525 (ca 11, 1999) **(private cause of action recognized; no intent required. . . tangential too disparate impact)**.  The *Burton* case also emphasizes that Sec. 2 enforcement of the Voting Rights Act was designed as a means of eradicating voting practices that minimized or cancelled out the voting strength and political effectiveness of a minority group.

Plaintiffs contend that they have *standings* under the facts alleged in its Complaint and comes within the phantom "zone of interest" created by the defendants Supportive Brief.

## Response to Defendants' Argument VI

The defendants contend that *Delta Special School District No. 5 v. State Board of Education*, 745 F.2d 532 (8th Cir. 1984), prohibits a school district from asserting violations of Due Process and Equal Protection under the Fourteenth Amendment of the U. S. Constitution.  In many cases -- but not all -- the contention of the defendants on this issue would be correct.  However, there is no school districts that are named as a party to the present lawsuit.  The defendants by their pleadings are attempting in some manner to "intervene" the Lake View School District, Inc. into this lawsuit.  Even if that was possible, *Delta Special School District No. 5* would not be applicable.  There is no immunity either actual or qualified for the defendants in the instant cease.  Qualified immunity only shields State's actions from liability in a lawsuit where the conduct does not violate clearly established statutory and constitutional rights of which a reasonable person should have known.  *Miller v. Schoenen* 75 F.3d 1305 (8th Cir.); *Harlow v. Fitzgerald*, 457 U. S. 800 (1982).  Under the finding of the Court in *Welch v. Texas Dept of Ed. and Public Transportation*, 483 U. S. 468, (1987); *Rapides v. Board of Regents of University System of Georgia*, 535 U. S. (2002), the Court again recognized that a State could waive its sovereign immunity.

Ordinarily, state officials are shielded from 1983 liabilities, if their conduct did not violate clearly established constitutional rights of which a reasonable official would have known. *Harlow v. Fitzgerald, supra*  A right is clearly established under *Anderson*

*v. Creighton*, 483 U. S. 635, 640 (1987) when a reasonable official would have understood what he was doing violates a known right. In the instant cause, the Voting Rights Act of 1965 is presently in its fiftieth year of existence. As a matter-of-fact, as this Brief is being written the Fiftieth Year Commemoration of the Voting Rights Act is being celebrated in a week long consideration in the State of Alabama. Obviously, the defendants in this cause knew that to summarily close the former Lake View School District without the opportunity for due process, dilute the voting strength of the individual plaintiffs and their protected class in this cause and their abilities to elect representatives of their choice to govern the educational policies of their children; take the property of the plaintiffs as shareholders in the Lake View School District without due process; confiscate local tax monies belonging to the plaintiffs without notice or due process; continue to collect taxes on the properties of the instant plaintiffs without their permission and in this specific cause to collect the tax on the plaintiffs that is higher than the tax that is being collected in the Barton School District, see Exhibit 3, supra, give rise to acknowledgment that these officials as defendants in this cause knew or should have known that they were violating plaintiffs' rights.

However, more pointedly there has been a *waiver* of the defendants and the State as an entity of Eleventh Amendment immunities and its sovereign immunity. Needless to say, in *Lake View I, II, and III*, the Arkansas Supreme Court found that the State had no sovereign protection. Likewise, in *Lake View I, II, and III*, the Governor of the State of Arkansas made no objections to his participation as the defendant acknowledging his controlled direction and nexus with the implementation of State educational enactments and enforcement of constitutional provisions. *Estoppel* is available to the plaintiffs as a

remedy for preventing this Governor from taking an inconsistent position in this cause of action than he took in the State action having *waived* any objections as a party. *Daley v. City of Little Rock*, 818 S.W.2d 259 (Ark. Appl., 1991). Indeed, since the Governor has been denied or has waived any claims of not being a proper party for the purpose of injunctive relief under *Lake View I, II and III* and, in fact, hired the Honorable Judge Leon Holmes to personally represent him at the Masters phase of the June 18, 2004 supplemental opinions, supra. It is he that the doctrine of *res judicata* and/or issue preclusion should apply, vis-a-vis his attempts to be dismissed as a party to an action in which there is a federal challenge to the state's alleged violation of federal law pertaining to educational issues and state education statutes.

The *waiver* in this cause checks/defeats any attempts of the defendants to argue *Delta Special School District No. 5* is found in the declaration of the Court in *Stanley v. Darlington County School District*, 879 F.2d 1341 (D.S.C. 1995); *Sandoval*, supra. Not only does the *Stanley v. Darlington* case brings introspection to the Court as it relates to the closing of African-American school districts while allowing white school districts to remain open and the constitutional prohibitions against same, it also provides clearly that when State and its educational agencies are recipients to federal funds for educational purposes that subject them to suits under statute prohibiting race discrimination via State programs or activities receiving federal assistance. The receipt of these funds abrogates the effects of the Eleventh Amendment immunity.

Additionally, the Equal Education Opportunity Act specifically negates the Eleventh Amendment immunities. As previously mentioned, even if the plaintiffs in this case was in fact the Lake View School District, Inc. it would have standing to assert a

claim against the State which would not be barred by Eleventh Amendment immunities since the State had already waived its Eleventh Amendment immunities in the receipt of these federal funds.   Additionally, as cited in *Stanley* other school districts have withstood Eleventh Amendment immunities claims and were granted *standing* by the federal judiciary to sue state defendants in furtherance of their affirmative duty to eliminate educational discrimination based on race. [Citing *Little Rock School District v. Pulaski County Special School District*, 584 F. Supp. 328, 352 (E.D. of AR. reversed, remanded 738 F.2d 82, 8th Cir. 1984); *Board of School Directors v. Wisconsin*, 659 F.2d 82 (E.D. Wisconsin, 1985)]. Also, see *Darlington*, supra, 879 F. Supp. at 1356 (standing recognized for school districts to bring actions challenging validity of state statues).  The Court should also visit the cases of *Powell v. Ohio*, 489 U. S. 400 (1991); *Akron Board of Education v. State Board of Education*, 490 F.2d 1285, (6th Cir.).

Finally, the Court found in *Stanley v. Darlington* that federal courts have inherent authorities to compel compliance with constitutional provisions and because the school district in that case claimed relief as based upon the Fourteenth Amendment, and Title VI standing was satisfied; *Hudson Valley Freedom Theater, Inc. v. Hiembach*, 671 F.2d 702 (2nd Cir 1982).

The plaintiffs in this cause have alleged violation of Title VI.   The defendants have not responded to that allegation within the context of its Motion to Dismiss or Supportive Brief.  The Eleventh Amendment immunity is not a defense to a Title VI action because Congress expressly abrogated the Eleventh Amendment immunity for suit brought under Title VI as to any violation that occurred in whole or in part after October 21, 1986, 42 U. S. C. § 200d-7.  The Civil Rights Restoration Act reinstated a broad

concept of programs and activities which embraces the concept that even if the discrimination complained of by a party does not relate to a specific program or activity receiving financial assistance the Eleventh Amendment immunity is still abrogated. It is the receipt of funds as a whole and not the receipt of funds to some particular branch of government which eviscerate the Eleventh Amendment immunity. *Radcliff v. Landau*, 833 F.2d 1483 (9th Cir 1989). When the Court has properly obtained jurisdiction of a suit by reason of a federal question, it has the authority to decide other federal questions, and State law issues that may be presented. *Siler v. Louisville & N.R. Company*, 213 Ark. 753 (1909).

The defendants' argument on this issue must fail unless there is a proof at a later stage of the trial that shows that this State does not receive the federal funding asserted.

### Response to Defendants Argument VII

A claim is intertwined with the filing of an action in Federal District Court with previous litigation in State Court under *Rooker-Feldman* if there is no effort on the part of the federal plaintiffs charge that the previous State Court's decision wrongly decided or there is no effort on their part to reverse the State Court's decision or void its ruling. *Charchenko v. City of Stillwell*, 47 F.3d 981 (C.A. 8th Cir. 1995). *Rooker-Feldman* does not prohibit a Federal District Court from granting a separate independent type of relief, even if it is collateral.

It is the burden of the defendants in this cause to have simply alleged that there is a conflict with *Rooker-Feldman* or with the doctrine *res judicata*. Defendants in this cause have simply alleged there is a conflict with *Rooker-Feldman* and/or with the doctrine of *res judicata* in the bringing of this federal action by the plaintiffs. There is

not one specific instance in the brief of the defendants on this issue that illustrates the conflict. What is the judgment of the state court that is being threatened by the instant complaint? There is no answer to this question in the Motion or Brief of the defendants.

What is the source of the *inextricable intertwine* between the present federal complaint and the State action? The defendants' Motion and Brief does not give an answer to this query. It is the obligation of the defendants to clearly present his Motion for Dismissal specifically. There are "boiler-plate" assertions made by defendants in their Motion and Brief to Dismiss and this Court has a duty to deny defendants' Motion to Dismiss based upon these insufficiencies. It is normally improper for a trial court to look beyond the Complaint in deciding a Motion to Dismiss. See *Guthrie v. Tyson Foods, Inc.*, 285 Ark. 95, 685 S.W.2d 164 (1985); *Deitsch v. Tillery*, 309 Ark. 401, 833 S.W.2d 760 (1992).

Defendants assert that under the circumstances of *Kerr v. Rainey*, 305 F. Supp. 1152 (W.D. Ark. 1969), the Court can go beyond the actual pleading and look to other evidence under, i.e. review the action or non-action of the Arkansas Supreme Court's Masters. There is no basis for preclusion under U.S. Constitution, Article IV, §1, because as previously stated, there has been no decision by either a trial court in the State judiciary or the Arkansas Supreme Court in any of the Lake View finance cases where the issues raised in the Motion to Dismiss by the defendants was litigated.

At the time *Lake View III* was argued in 2000, there was no Act 60 or 70. *Lake III* upon review as described by the Supreme Court in 2002, the 84th General Assembly of Arkansas Legislature was a future event. The legislature did not meet until January 2003.

*U.S. v. Owens*, 54 F.3d 271 (C.A. 6th Ohio, 1995) provides that the *Rooker-*

*Feldman* doctrine does not apply to bar suit in federal court brought by the parties that are not the parties in the State case. The defendants assert that because plaintiffs were part of the class in the State litigation regarding school finance they are precluded from bringing an action on issues not litigated in Lake View I, II, or III. Plaintiffs contend that this view of the *Rooker-Feldman* doctrine and *res judicata* is in error. *Rooker-Feldman* does not ordinarily apply when there is a general challenge to the application of State laws or State proceedings. *Rooker-Feldman* requires an adjudication of the issues in the State Court proceedings in order to be a bar to the jurisdiction of the federal court. See *Allen v. Mucury,* 449 U.S. 90, 104 (1980). See *Simes*, infra.

Undoubtedly, the *Allen* doctrine applies to this case. There has been no adjudication of the instant issues in the State Court proceedings and there can be no application of *Rooker-Feldman*. If this Court applies *Rooker-Feldman* to causes of this nature, then parties in the position of plaintiffs will have an injury in a cause, but no forum in which to litigate. The instant plaintiffs' cause of action is not a part of *Lake View I, II, or III* and the question of the application of federal law to the instant cause, plaintiffs contend brings a press challenge to the federal judiciary on the subject of whether education has now become so important to this society that it now ranks as a U.S. constitutionally protected right. The present cause of action is different from any litigation that has been brought on the subject of the constitutional rights of African-American citizens via the constitutionality of the State policy of school finance as it relates specifically to constitutional protected rights of African-Americans in the area of their educational needs, protection of their voting rights against dilution to the extent that they no longer exist. This is a distinct cause of action. See *Wu v. Thomas,* 863 F.2d

31

1543; rehearing denied, 871 F.2d 122 (Cir. Ct. 11 Ala. 1989); *South Delta Water Agency v. U.S. Dept. of Interior, Bureau of Reclamation,* 767 F.2d 531 (C.A. 9 Cal. 1985); *Cherokee Nation of Oklahoma v. U.S.,* 21 Cl. Ct. 565 (1990); *Sierra Club v. Secretary of Transportation,* 79 F.2d 776 (Ct. App. 1 Me. 1985).

In view of the factual and legal distinctions in the present cause of action and the previous State school finance litigation neither, *res judicata* nor *Rooker-Feldman* applies. The pleading of *Rooker-Feldman* by the defendants is a desperate attempt to smother the efforts of these plaintiffs to have their day in Court on the questions presented in their Complaint. These are federal questions. The dominant theme of the Complaint presents federal questions of law. In a most recent decision of the Eighth Circuit regarding both the issues of *res judicata* and *Rooker-Feldman*, the Court found in the cause of *Simes v. Huckabee,* 354 F.3d 833 (8th Cir 2004) that *Rooker-Feldman* nor *res judicata* applied when a claim was brought in federal court which even if it had been brought in State Court previously, that State Court had not reached a decision on the merit. Certainly, the State will not claim that there has been a State Court decision on Act 59 and 60 on the merit nor could the State claim that there has been a State Court's decision regarding violations of the plaintiffs federal voting rights or a determination of whether the taking of property from the African-American plaintiffs in this cause which they claim were paid for by non-State money is an unconstitutional taking.

In conclusion, the defendants claim that there can be no judgment rendered in this cause against the State that would affect the State's treasury. This is not true. The Court has made it very plain in the *Hutto case, supra,; Milliken v. Bradley* 433 U. S. 267 (1997); *Edelman v. Jordan,* 415 U.S. 651 (1974); and in *Alma Hill School, supra* that

when it is necessary for the purposes of giving a full and complete remedy to a prevailing party no such restraints exists on the federal court's authority.

It is undisputed that the paramount, dominating, and all consuming emphasis of the implementation of Acts 59 and 60 has unconstitutional racial implications. In an Attorney General Opinion attached as Exhibit 2 to this Complaint, the Court can readily observed this compelling and unpleasant feature of Act 60. Act 60, has particular overt racial implications. Without much legal doubt, Act 60 is not a narrowed tailored to address the issue of equality or adequacy; to violate the rights pled by plaintiffs-an act of this nature is not constitutionally protected. It is a legislature that distinguishes between persons in various districts on the basis of race. Absence a compelling State interest to discriminate against African-American citizens in the Lake View School District some who are plaintiffs in this case the legislation runs the file of *Wygant v. Jackson Board of Education*, 476 U.S. 267, 277-278 (1986); *Shaw v. Reno*, 509 U. S. 630, 643 (1993) shows a particular distaste by the Court for racially based legislation.

*Strict scrutiny* must be applied when a Court reviews race based legislation. Instead of Act 60 fostering an elimination of racial inferiority and promoting racial tranquility, it has served and is serving as a very opposite vehicle. *Richmond v. J. A. Croson Co.*, 488 U. S. 469 (1989); *Grutter v. Bollinger*, 539 U.S. 360 (2003). The Lake View School District offered to consolidate with the Helena-West Helena School District; it offered to consolidate with the Holly Grove School District; it offered to consolidate with the Marvell School District. The State Board of Education would not consider any of these school districts because it did not fit into their plan of racial discrimination against African-American districts. The purpose of Act 60 at the end of

the day was to eliminate all vestiges of African-American control, input and dynamics in the educational product that is visited on African-American children throughout this State in African-American predominated districts.

In a particular instant of Humphrey Public School System the State School Board denied Humphrey's petition to consolidate with Stuttgart School District simply because Stuttgart had a majority African-American school district and the combination of these two districts was taboo.   However, the State school board forced Humphrey to consolidate with DeWitt School District which requires them to bus across the Stuttgart School District in order to promote this State policy of racial hostility toward predominantly African-American districts.   A district under Act 60 can become predominantly Caucasian but it cannot become predominantly African-American or increased the percentage of African-American students.   Under the Court's rule, the Court using strict scrutiny found that State remedial goals must fit closely so that there is little or no possibility for unacceptable classification or illegitimate racial prejudice or stereotype.   Lake View School District it is asserted even with all of its financial drawbacks produced students equal in quality to any of the school districts in Phillips County particularly the Barton School District.   Rather than consolidating Barton with Lake View, the racially motivated implementation of Act 60 placed a unconstitutional burden on the African-American plaintiffs of Lake View to satisfy the State goal via consolidation.   **The 350 "ADM" is pretextual, at best, while the state defendants claim 350 "ADM" as a death-knell to their ability to provide equity and adequacy for plaintiffs' students in their small school districts; while the state defendants claim 'economy of scale' as a rationale for the 350 "ADM" cut-off, the defendants**

simultaneously fosters the drive for smaller, more adequate, more efficient, and a more equitable parallel state school system, commonly referred to as Charter Schools. There is not one Charter School program sponsored by the State in which they do not proclaim the virtues of smaller schools, smaller classes, and smaller campuses. But, the telling point of all that emphasizes the pretextuality of the state defendants' consolidation of the plaintiff's local school is the fact that no Charter School that plaintiffs have been able to discover in the entire State of Arkansas has more than 350 "ADM".

As set-out in the Complaint, this is as it has always been. The State of Arkansas violates the law by maintaining segregated school system; the State of Arkansas violates the law by maintaining unequal pay to African-American teachers and administrators; the State of Arkansas violates the law by placing defected equipments and school supplies in African-American schools, but at the end of the day it is not the State of Arkansas that pays: It is those that have been victims of the State's unconstitutional policies. While the *Gratz v. Bollinger*, 539 U.S. 244 (2003) allows race as a consideration-as a *'plus'*-in the process for admission it cannot be under Bollinger the dominating factor in the process. The dominating feature of consolidation is (a) that no African-American school would be the recipient body for a white school and (b) that the burden of consolidation and the burden of giving a figment of equality and equity in the school finance policy of this State would as a nature course of event cause those who have suffered the most under the unconstitutional patterns of finance to suffer the most in order to cure it.

The state defendants have already publicly admitted through the Governor's office that it has not saved any public funds through the implementation of Acts 59 and

60 rendering any arguments via 'economy of scales' fruitless; the public record of the consolidation hearings will show that racial considerations were unconstitutionally considered and that the reason that all of the African-American schools were closed or merged with whites was the consuming reality that white children through their parents' efforts would leave the public school system before merging with any African-American school district.

Of course, plaintiffs contend there is no constitutional footing for this court to condone this overt racially motivated reason while the plaintiffs are suffering the loss of control of its students' educational development; loss of control of who will be the instructors and administrators over their students; loss of control over whether their kids will be taught a totally Eurocentric educational and world view while simultaneously being denied any possibility of an educational relationship with Afrocentricity (continuing the present crisis in African-American self-loathing); loss of the cultural benefits of African-American participation in the development or redevelopment of a culture of embrace of things of learning, and lastly, the continued promotion of a present system which elevates all things Caucasian, demeans all things African to the degree that under the implementation of Acts 59 and 60 no additional funding would go African-American school districts and no white students would be going to African-American school districts. *Lee v. Macon County Board of Education*, 448 F.2d 746 (1971).

Certainly, Exhibit 2, supra, contains indisputable evidence of the overwhelming racial considerations that permeated the state defendant Board of Education, because the Attorney General opinions and instructions therein became the law under which the defendant Board operated. However, if the court thinks that the ten minutes due process

36

allowed at sub-section 408 of Exhibit 1, combined with the sentiments and directions of the Attorney General opinion illustrated by Exhibit 2, could still produce a non-racial, fair, unbiased, and impartial consideration of the plaintiffs' rights under the law, both state and federal, then this court need only look at Exhibit 4, which is a copy of a interoffice memo to Governor Mike Huckabee, which ironically is entitled, "Biased of State Board Members to shed those illusions."

We believe that this Court has an obligation to disregard and deny the Motion to Dismiss in this case.

WHEREFORE, plaintiffs pray that the Motion to Dismiss be denied.

Respectfully submitted,

J. L. WILSON, ABN73128
521-523 Plaza
West Helena, AR  72390
(870) 572-1533

## CERTIFICATE OF SERVICE

I, J. L. Wilson, do hereby certify that I have served a copy of the above and foregoing pleading upon the attorney(s) of record and the court by placing a copy of same in the U.S. Mail, or hand delivered to:

> Ms. Collett Honorable
> Assistant Attorney General
> 323 Center Street, Suite 200
> Little Rock, AR  72201

on  this 15th day of March 2005.

J. L. WILSON

UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

# *Exhibits Attached to Original Document in Courts's Case File*